FILED

MAR 3 1 2011

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA, | * | CIV 10-3006-RAL |
| COUNTY OF CHARLES MIX, and | * | |
| CITY OF WAGNER, | * | |
| | * | |
| Plaintiffs, | * | OPINION AND ORDER |
| | * | GRANTING IN PART AND |
| vs. | * | DENYING IN PART |
| | * | SUMMARY JUDGMENT |
| UNITED STATES DEPARTMENT OF | * | MOTIONS AND REMANDING |
| THE INTERIOR, LARRY ECHO | * | CASE |
| HAWK, in his official capacity as | * | |
| Assistant Secretary of Indian Affairs, | * | |
| MICHAEL BLACK, in his official | * | |
| capacity as Regional Director, Great | * | |
| Plains Region, BEN KITTO, in his | * | |
| official capacity as Superintendent of the | * | |
| Yankton Agency, and YANKTON | * | |
| SIOUX TRIBE, | * | |
| | * | |
| Defendants. | * | |

## I. INTRODUCTION

Plaintiffs State of South Dakota, County of Charles Mix, and City of Wagner (collectively "Plaintiffs") filed this action seeking declaratory and injunctive relief from the Department of the Interior's decision to take 39.9 acres of land into trust for the Yankton Sioux Tribe ("Tribe"). Defendants United States Department of the Interior; Larry Echo-Hawk, Assistant Secretary of Indian Affairs, United States Department of the Interior; Michael Black, Great Plains Regional Director, Bureau of Indian Affairs ("BIA"); Ben Kitto, Yankton Agency Superintendent; and the Yankton Sioux Tribe (collectively "Defendants") moved to dismiss or, in the alternative, for summary judgment (Doc. 13). Plaintiffs then filed a cross-motion for summary judgment (Doc. 20).

## II. FACTS

On March 1, 2004, the Business and Claims Committee ("Committee") of the Tribe enacted a resolution requesting that the BIA accept a 39.9-acre parcel of land into trust for the Tribe. (Doc. 13-1, Doc. 23). The land is located in Charles Mix County, South Dakota, and is known as the

"Wagner Heights Addition." (Doc. 13-1, Doc. 23). In its resolution, the Committee stated that it was responsible for providing suitable housing for the Tribe and its members, that the Wagner Heights Addition currently contained 11 residential homes and a 20-unit elderly complex, and that the use of the property would remain the same should the BIA accept it into trust. (Doc.13-1, Doc. 23).

On March 19, 2004, the Acting BIA Yankton Superintendent ("Superintendent") sent a letter to Plaintiffs, Lawrence Township, and the Wagner Community School District explaining that the BIA had received the Tribe's trust application and was considering it. (Doc. 13-1, Doc. 23, A.R. 1596-1610). Plaintiffs filed a Freedom of Information Act ("FOIA") request, seeking "the actual applications by which the Yankton Sioux Tribe requested the BIA to take these lands into trust, any further communications or other communications from the Yankton Sioux Tribe with regard to these proposed applications, and any other documentation in the file with regard to these proposed applications." (Doc. 22, Doc. 27, A.R. 1832-33). On April 12, 2004, the BIA responded by supplying Plaintiffs with the Tribe's trust application and copies of abstracts of title for the land comprising the Wagner Heights Addition. (Doc. 22, Doc. 27, A.R. 1838-1844). The State, County, and City each provided comments to the Superintendent expressing their opposition to the trust acquisition. (Doc. 13-1, Doc. 23).

On August 25, 2004, the Superintendent issued a decision letter approving the acceptance of the Wagner Heights Addition into trust for the Tribe. (Doc. 13-1, Doc. 23). Plaintiffs filed a second FOIA request seeking any document of any kind added to the Tribe's trust acquisition file after the BIA's April 12, 2004 response to Plaintiffs' first FOIA request. (A.R. 1845). In response to Plaintiffs' second FOIA request, the BIA supplied Plaintiffs with a document from the Charles Mix County Abstract Company and with letters submitted by those who opposed the trust acquisition, but with no additional information from the Tribe. (Doc. 22, Doc. 27); South Dakota

2

v. Cnty. of Charles Mix, & City of Wagner v. Acting Great Plains Reg'l Dir., 49 IBIA 84, 89

(2009).

Plaintiffs then appealed the Superintendent's determination to the Regional Director ("RD").

(Doc. 13-1, Doc. 23). Before rendering a decision, the RD sought and obtained additional

information and documents concerning the Wagner Heights Addition from both Plaintiffs and the

Superintendent. Acting Great Plains Reg'l Dir., 49 IBIA at 90-91. The RD based her decision on

a number of these new documents, Id. at 99-101, but she never supplied the following 23

documents to Plaintiffs:

> 1. A November 21, 2006 letter from the Superintendent
> responding to the Great Plains Regional Realty Office's request
> for further information on the Wagner Heights trust acquisition.
> The letter contains a list of the documents the Superintendent is
> sending to the Realty Office, as well as some brief comments by
> the Superintendent concerning the Committee's authority to
> request that land be placed in trust and the continued payment of
> certain fees. (A.R. 1393).
> 2. An October 10, 2006 restrictive covenant acknowledgment,
> stating that the Committee is aware that certain restrictive
> covenants may encumber the Tribe's right to use and develop the
> property, and that the Committee "agree[s] to be bound by those
> restrictions and limitations so long as they remain effective."
> (A.R. 1444).
> 3. A certified enrollment census stating that 9,649 members were
> enrolled in the Tribe as of December 31, 1996. The document is
> signed by the Enrollment Officer of the Tribe and is dated
> November 17, 2006. (A.R. 1395).
> 4. A certified enrollment census stating that 11,363 members
> were enrolled in the Tribe as of November 16, 2006. The
> document is signed by the Enrollment Officer of the Tribe and is
> dated November 17, 2006. (A.R. 1396).
> 5. An "agreement" between Francis Doom and the Wagner
> Development Corporation. The "agreement" is dated July 13,
> 1972 and contains a restrictive covenant. (A.R. 1397-98).
> 6. A November 9, 2006 letter from the Yankton Sioux Housing
> Authority explaining that it pays a monthly water bill payment of
> $3,301.88 for certain "elderly complexes" and that the "13
> residential units that are identified as the Wagner Heights
> Additions are responsible for their own water and sewer bills."
> (A.R. 1399).

3

7. A June 13, 2005 memorandum from a BIA Regional Environmental Scientist containing his recommendations. (A.R. 1401-1405).

8. A Phase I Environmental Site Assessment of the Wagner Heights Addition. (A.R. 1406-1439).

9. A May 10, 2006 letter from the Chief Executive Office of the Public Health Service, Wagner Health Center in Wagner, South Dakota, discussing payments that the Indian Health Service ("IHS") makes to the Wagner/Lake Andes Ambulance Program for ambulance services. (A.R. 1440).

10. A June 14, 2006 letter from the Special Agent in Charge, BIA Law Enforcement Services, stating that if the Wagner Heights Addition is placed in trust, the BIA Office of Law Enforcement Services would have criminal jurisdiction and patrol responsibility over the land. (A.R. 1441).

11. An October 20, 2006 letter from the Yankton Sioux Housing Authority stating that the Wagner Heights Addition contains "13 residential units and an elderly complex containing 20 individual apartments with assisted living quarters," and that approximately 33 school-aged children reside on the property and attend the Wagner Community School District. (A.R. 1442).

12. An October 10, 2006 Committee resolution stating that the "Yankton Sioux Tribe's Business and Claims Committee, by this resolution agrees formally to be bound by the restrictive covenant on the Wagner Heights Addition property . . ." (A.R. 1445).

13. An August 31, 2006 email from the Great Plains Office Deputy Realty Officer, discussing the desire of the Tribe and IHS to build houses for IHS employees on the Wagner Heights Addition after the BIA brings the land into trust. (A.R. 1449).

14. A February 8, 2006 Committee Resolution that explained that IHS was formally requesting to obtain land from the Tribe to build staff quarters for the Wagner health care facility. The resolution identified a portion of the Wagner Heights Addition as one of two possible sites for the staff quarters, and authorized IHS to conduct an "archaeological and legal survey to determine which site is feasible." (A.R. 1451).

15. A July 28, 2005 memorandum from the Superintendent of the Yankton Agency to Jim Geffre, Realty Officer Great Plains Regional Office. In the Memorandum, the Superintendent briefly discusses what will occur in regard to ambulance services, housing policies and procedures, and the fielding of 911 calls should the BIA place the Wagner Heights Addition in trust. (A.R. 1486-87).

16. An April 21, 2005 memorandum from the Great Plains Region Realty Officer to the ECSR Manager of the Great Plains Region. In the memorandum, the Realty Officer asks the ESCR

4

Manager to review the Level I Contaminant Surveys for the Wagner Heights Addition and the Yankton Sioux Travel Plaza. (A.R. 1507).

17. A December 9, 2006 email from the Great Plains Office Deputy Realty Officer asking for information and documentation relating to the Wagner Heights fee to trust process. (A.R. 1152-53).

18. A December 11, 2006 email from Deda Orozco of the Aberdeen BIA to the Deputy Realty Officer. The email was in response to the Deputy Realty Officer's questions about the Wagner Heights Addition (A.R. 1152-53), and provided information about the cost of 911 calls, the distance between the IHS hospital and the Wagner Heights Addition, the tribal housing authority's payment for water and sewage. The increase in tribal membership, the housing authority's provision of housing units to Native American Veterans, whether tribal members can lease or buy homes on the Wagner Heights Addition, and the response time of law enforcement to the property. (A.R. 1156-57).

19. A 1994 fire protection agreement between the BIA and the Lake Andes-Ravina fire district. (A.R. 504)

20. A 1993-1994 fire protection agreement between the BIA and the Wagner fire district. (A.R. 507).

21. A 2006 fire protection agreement between the BIA and the Lake Andes-Ravina fire district. (A.R. 1306).

22. A 2006 fire protection agreement between the BIA and the Wagner fire district. (A.R. 1310).

23. An April 11, 2007 email from the Deputy Realty Officer discussing Plaintiffs' request for a copy of the complete administrative record after Plaintiffs filed their appeal with the IBIA. (A.R. 1298).

The RD affirmed the trust acquisition in a January 9, 2007 decision letter. (Doc. 13-1, Doc. 23).

Plaintiffs appealed the RD's decision to the Interior Board of Indian Appeals ("IBIA"). (Doc. 13-1, Doc. 23); (A.R. 1095). Plaintiffs sent a letter to the BIA requesting a copy of the administrative record the RD relied on in deciding to take the Wagner Heights Addition into trust. (A.R. 1295). In response to their request, Plaintiffs received two different versions of the administrative record, the first in early May of 2007, and the second in late June of 2007. (Doc. 22, Doc. 27);(A.R. 891, A.R. 1295). The second version of the administrative record contained more documents than the first and was accompanied by a letter from the BIA explaining that a

copying error caused some portions of the administrative record to be inadvertently left out of the first version. (A.R. 891). After Plaintiffs received the second copy of the administrative record, both parties completed a full round of briefing before the IBIA.[1] Acting Great Plains Reg'l Dir., 49 IBIA at 102.

On April 16, 2009, the IBIA issued an opinion affirming the BIA's acceptance of the Wagner Heights Addition into trust. (Doc. 13-1, Doc. 23). The IBIA found that the RD "clearly erred" by failing to provide Plaintiffs with the additional information received by the RD from the Superintendent, but that this error was harmless because Plaintiffs "received a copy of the complete record on appeal to the [IBIA] and have been able to respond to the supplemental documents in their pleadings before the [IBIA]." Acting Great Plains Reg'l Dir., 49 IBIA at 101.

Plaintiffs now contend that the trust acquisition was unlawful for a number of reasons. First, Plaintiffs challenge the constitutionality of Section 5 of the Indian Reorganization Act ("IRA"), which provides the Secretary of the Interior ("Secretary") with the authority to acquire trust land for Indian tribes. Plaintiffs claim that Section 5 is an unconstitutional delegation of legislative power, that it operates to deprive South Dakota of a republican form of government, and that Section 5 violates both the Tenth and Fourteenth Amendments.[2] Next, Plaintiffs argue that the Committee exceeded its authority by passing the resolution requesting that the BIA take the Wagner Heights Addition into trust. Plaintiffs also assert that their due process rights were violated in a number of ways, including bias on the part of BIA decision-makers and withholding of evidence

---

[1] Plaintiffs still contend that they did not receive the entire administrative record until they appealed the matter to this Court. Specifically, Plaintiffs claim that the second version of the administrative record was missing the two 2006 fire protection agreements and the April 11, 2007 email from the Deputy Realty Officer discussing Plaintiffs' request for a complete copy of the administrative record. (Doc. 21 at 19).

[2] Although Plaintiffs' counsel at oral argument chose not to argue these challenges to the constitutionality of Section 5 of the IRA, this Court addresses these claims because they are in Plaintiffs' Complaint.

considered and used by the RD in her decision making. Plaintiffs then challenge the BIA's publication of notice that it intended to take the Wagner Heights Addition into trust. Finally, Plaintiffs argue that the RD and the IBIA's decisions were arbitrary and capricious and therefore should be set aside under the Administrative Procedure Act ("APA").

## III. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Both Plaintiffs and Defendants have filed motions for summary judgment. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In a determination of whether summary judgment is warranted, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortgage & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1). "To survive summary judgment, a plaintiff must substantiate his allegations with enough probative evidence to support a finding in his favor." Adam v. Stonebridge Life Ins. Co., 612 F.3d 967, 971 (8th Cir. 2010) (quoting Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008)). In this case, neither Plaintiffs nor Defendants point to any genuine dispute of material facts and both Plaintiffs and Defendants have filed motions for summary judgment.

### B. CONSTITUTIONALITY OF SECTION 5 OF THE IRA

#### 1. Non-delegation Challenge

Plaintiffs claim in Count 1 of their Complaint that Section 5 of the IRA is an unconstitutional delegation of legislative power because it fails to establish adequate standards by

7

which to guide the BIA's decision concerning the taking of land into trust. (Doc. 1. at ¶ 52).
Section 5 of the IRA provides in pertinent part that:

> The Secretary of the Interior is authorized, in his discretion, to
> acquire, through purchase, relinquishment, gift, exchange, or
> assignment, any interest in lands, water rights, or surface rights to
> lands, within or without existing reservations, including trust or
> otherwise restricted allotments, whether the allottee be living or
> deceased, for the purpose of providing land for Indians.
> ***
> Title to any lands or rights acquired pursuant to this Act . . . shall be
> taken in the name of the United States in trust for the Indian tribe
> or individual Indian for which the land is acquired, and such lands
> or rights shall be exempted from State and local taxation.

25 U.S.C. § 465.

The United States Court of Appeals for the Eighth Circuit has addressed whether Section

5 of the IRA is an unconstitutional delegation of legislative power. In South Dakota v. U.S. Dep't

of Interior, 423 F.3d 790 (8th Cir. 2005) ("South Dakota II"),[3] the Secretary exercised its authority

under Section 5 of the IRA and accepted 91 acres of land into trust for the Lower Brule Sioux

Tribe. Id. at 794. The State and other plaintiffs raised several arguments in opposition to the

Secretary's decision, including a non-delegation challenge identical to the one Plaintiff makes in

the present case.[4] The Eighth Circuit explained that "Congress may delegate its legislative power

---

[3] There are four prior published opinions involving taking lands into trust between the State
of South Dakota and the United States Department of Interior, to which this Court cites in this
Opinion and Order. To avoid confusion, this Court refers to them in chronological sequence as
South Dakota I, South Dakota II, South Dakota III and South Dakota IV.

[4] Counties within the state of South Dakota and the State itself have raised this same non-
delegation argument in a number of different trust acquisition cases. See South Dakota v. U.S. Dep't
of Interior, 314 F. Supp. 2d 935, 949-51 (D.S.D. 2004) ("South Dakota I") (stating that "Congress
has clearly delineated the 'boundaries' of the Secretary's authority as bestowed upon him by § 465.");
South Dakota v. U.S. Dep't of Interior, 401 F. Supp. 2d 1000, 1005 (D.S.D. 2005) ("South Dakota
III") (finding South Dakota II "factually identical and controlling" and holding that Section 5 of the
IRA was not an unconstitutional delegation of power); South Dakota v. U.S. Dep't of Interior, 487
F.3d 548, 551 (8th Cir. 2007) ("South Dakota IV") (declining to reconsider its decision in South

8

if it lays down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." Id. at 795 (citation and internal marks omitted). The South Dakota II Court then rejected the contention that Section 5 failed to delineate any boundaries governing the Secretary's trust acquisition decisions, instead finding that:

> [A]n intelligible principle exists in the statutory phrase 'for the purpose of providing land for Indians when it is viewed in the statutory and historical context of the IRA. The statutory aims of providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from the prior allotment policy sufficiently narrow the discretionary authority granted to the Department.

Id. at 799.

Other courts considering non-delegation challenges to Section 5 have reached the same conclusion. See Michigan Gaming Opposition v. Kempthorne, 525 F.3d 23, 33 (D.C. Cir. 2008) (agreeing with the First, Eighth, and Tenth Circuits that Section 5 is not an unconstitutional delegation of legislative authority); Carcieri v. Kempthorne, 497 F.3d 15, 43 (1st Cir. 2007) ("We hold that section 465 is not an unconstitutional delegation of legislative authority."); United States v. Roberts, 185 F.3d 1125, 1137 (10th Cir. 1999) (rejecting argument that Section 5 unconstitutionally "delegates standardless authority to the Secretary"); Cent. New York Fair Bus. Ass'n v. Salazar, No. 608-CV-660, 2010 WL 786526, at *4 (N.D.N.Y. Mar. 1, 2010) ("Every court to consider a delegation challenge to § 465 has rejected it and found that agency regulations sufficiently limit the Secretary of the Interior's discretion.") (citations omitted). Accordingly, this Court concludes that Section 5 of the IRA is not an unconstitutional delegation of legislative

---

Dakota II). Indeed, this Court recently rejected an identical non-delegation challenge in South Dakota v. U.S. Dep't of Interior, No. Civ. 10-3007, 2011 WL 382744, at * 3 (D.S.D. Feb. 3, 2011).

9

authority. Therefore, summary judgment for Defendants on Count 1 of Plaintiffs' Complaint is proper.

## 2. Tenth Amendment Challenge

Plaintiffs contend in Count 2 of their Complaint that Congress lacked the authority to enact Section 5 of the IRA, and in Count 3 of their Complaint that Section 5 of the IRA violates the Tenth Amendment to the United States Constitution. (Doc. 1 at ¶ 56). Specifically, Plaintiffs claim that the authority to take off-reservation land into trust for Indian tribes was not a power delegated to Congress by the Constitution, and that the "authority over such lands was reserved to the states by the Tenth Amendment." (Doc. 1 at ¶ 56). The Tenth Amendment reserves to the states those powers not delegated to the federal government. See U.S. Const. amend. X.

If the Constitution delegates a power to Congress, however, the "'Tenth Amendment expressly disclaims any reservation of that power to the States.'" United States v. Crawford, 115 F.3d 1397, 1401 (8th Cir. 1997) (quoting New York v. United States, 505 U.S. 144, 156 (1992)). The Indian Commerce Clause provides Congress with the power to "regulate commerce . . . with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. The United States Supreme Court consistently has held that the Indian Commerce Clause grants Congress broad and exclusive authority to legislate in the field of Indian affairs. See United States v. Lara, 541 U.S. 193, 200 (2004) ("[T]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'") (citations omitted); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 62 (1996) ("If anything, the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause."); Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163,

10

192 (1989) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs.") (citations omitted); Morton v. Mancari, 417 U.S. 535, 551 (1974) ("With the adoption of the Constitution, Indian relations became the exclusive province of federal law."); Means v. Wilson, 522 F.2d 833, 839 (8th Cir. 1975) ("Under the Indian Commerce Clause, Congress has plenary authority over Indians.") (citing Worcester v. Georgia, 31 U.S. 515, 559 (1832)).

Under the Supreme Court's expansive interpretation of the Indian Commerce Clause, Congress had authority to enact Section 5 of the IRA. Because the Secretary's authority to accept land into trust for Indians flows from power delegated to Congress by the Constitution, Section 5 is consistent with the Tenth Amendment. See New York, 505 U.S. at 156; see also Carcieri v. Kempthorne, 497 F.3d 15, 39-40 (1st Cir. 2007), rev'd on other grounds ("Because Congress has plenary authority to regulate Indian affairs, Section 465 of the IRA does not offend the Tenth Amendment."); Central New York Fair Bus. Ass'n v. Salazar, No. 608-CV-660, 2010 WL 786526, at *4 (N.D.N.Y. Mar. 1, 2010) ("The Tenth Amendment is simply not implicated by the [Department of the Interior's] action under [Section 5] of the IRA because the Secretary's authority to take the land into trust for Indians is derived from powers delegated to Congress in Article I.") (citation omitted). Accordingly, summary judgment for Defendants is proper on Counts 2 and 3 of Plaintiffs' Complaint.

**3. Republican Form of Government Challenge**

Plaintiffs assert in Count 4 of their Complaint that Section 5 of the IRA deprives them of a republican form of government because Plaintiffs lose jurisdiction and authority over land that the BIA takes into trust for the Tribe. (Doc. 1 at ¶ 62). Article IV, § 4 of the United States

11

Constitution contains the "Guarantee Clause," providing that the "United States shall guarantee to every state in this union a republican form of government. . ." U.S. Const. art. IV, § 4. Claims under the Guarantee Clause usually are considered political questions, and courts rarely find them justiciable. See New York v. United States, 505 U.S. 144, 184 (1992) ("[T]he guarantee clause has been an infrequent basis for litigation throughout our history. In most of the cases in which the Court has been asked to apply the Clause, the Court has found the claims presented to be nonjusticiable under the 'political question' doctrine.") (citations omitted); see also Deer Park Indep. Sch. Dist. v. Harris Cnty. Appraisal Dist., 132 F.3d 1095, 1099 (5th Cir. 1998) ("[T]he Supreme Court has held that challenges to Congressional action under the Guarantee Clause are not justiciable.") (citations omitted); 13C Wright et. al. Federal Practice and Procedure § 3534.1 (3d ed. 2008) ("[I]t has been well established that political questions are presented by challenges to either congressional or state action grounded on the constitutional mandate in Article IV, § 4, that the United States shall guarantee every state a "Republican Form of Government."). Plaintiffs' Guarantee Clause challenge to Section 5 of the IRA presents a non-justiciable political question.

Even if Plaintiffs' Guarantee Clause claim were justiciable, Section 5 of the IRA does not violate the Guarantee Clause. The Supreme Court defined a Republican Form of Government in Duncan v. McCall, 139 U.S. 449, 461 (1891) as follows:

> [T]he right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves, but while the people are thus the source of political power, their governments, national and state, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities.

Id. The fact that Plaintiffs will no longer be able to exercise jurisdiction and authority over the Wagner Heights Addition does not pose a "realistic risk of altering the form or the method of functioning of [Plaintiff's] government." New York, 505 U.S. at 186; see also City of Lincoln v. U.S. Dep't of Interior, 229 F. Supp. 2d 1109, 1117 (D. Or. 2002) (holding that a transfer of tribal land located within city limits into trust did not violate the Guarantee Clause even though the transfer allowed tribal members to vote in local elections without being subject to local regulation or taxation). At most, the BIA's placement of the Wagner Heights Addition into trust merely reduces the area over which Plaintiffs may exercise certain jurisdictional powers of their already existing republican form of government. Summary judgment for Defendants is proper on Count 4 of Plaintiffs' Complaint.

### 4. Fourteenth Amendment Challenge

Plaintiffs contend in Count 5 of their Complaint that Section 5 of the IRA is unconstitutional under the Fourteenth Amendment because by taking land into trust, the United States "abridges the privileges and immunities of non-Indians who live on or who pass through that land." (Doc. 1 at. ¶ 66). Plaintiffs also argue that taking land into trust "denies such citizens equal protection, because they cannot participate in the government of the area and may be subject to the jurisdiction of a tribal government in which they may not participate." Id. at ¶ 67.

To begin with, it is questionable that Plaintiffs, as a State, County, and City, have standing to raise this claim on behalf of their citizens. See State of Iowa ex rel. Miller v. Block, 771 F.2d 347, 354-355 (8th Cir. 1985) (explaining that while courts have allowed some state *parens patriae* suits against the federal government in the past, the most "well-reasoned discussions of this type of suit disallow its use against the federal government . . .") (citing

13

Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 610 n.16 (1982) ("A

state does not have standing as *parens patriae* to bring an action against the Federal

Government.") (citation omitted)); Erwin Chemerinsky, Federal Jurisdiction 115 (5th ed. 2007)

("One important limit on parens patriae standing of state and local governments is that they may

not sue the federal government in this capacity, though they may sue the federal government to

protect their own sovereign or proprietary interests.").

Plaintiffs' reliance on the Fourteenth Amendment is misplaced. Section 1 of the

Fourteenth Amendment provides that "No *State* shall make or enforce any law which shall

abridge the privileges or immunities of citizens of the United States; nor shall any *State* . . . deny

to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV,

§ 1 (emphasis added). The Fourteenth Amendment, thus "by its very terms" applies only to state,

rather than federal, action. United States v. Morrison, 529 U.S. 598, 621 (2000); see also Russell

v. Hug, 275 F.3d 812, 822 (9th Cir. 2002) (explaining that the Privileges or Immunities Clause

of the Fourteenth Amendment "applies in terms only to actions taken by states, not to those . .

. taken by the federal government.").

Even if Plaintiffs had properly raised their equal protection claim under the Due Process

Clause of the Fifth Amendment, this argument would be unsuccessful.[5] The exclusion of non-

members of a Tribe from participation in tribal government does not constitute racial

discrimination or the drawing of impermissible classifications. The reason that non-Indians

living near the Wagner Heights Addition may not participate in internal tribal affairs is because

---

[5] The principles of equal protection apply to the federal government through the due process
clause of the Fifth Amendment rather than the Fourteenth Amendment. See Bolling v. Sharpe, 347
U.S. 497 (1954).

14

these non-Indians are not members of the Tribe, a quasi-sovereign political entity. United States v. Antelope, 430 U.S. 641, 646 (1977) ("federal regulation of Indian affairs is not based upon impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as a 'separate people' with their own political institutions . . .") (quoting Morton v. Mancari, 417 U.S. 535, 553 n.24 (1974)); see also Felix Cohen, Cohen's Handbook of Federal Indian Law § 14.01[2][b][ii] ("The unique status of Indian tribes under the Constitution and treaties establishes a legitimate purpose for singling out Indians as a class."). Accordingly, summary judgment for Defendants is proper on Count 5 of the Complaint.

**5. The Statutory Aims of Section 5 of the IRA**

Plaintiffs allege in Count 6 of its Complaint that accepting the Wagner Heights Addition into trust has "not been demonstrated to operate sufficiently to enable Indians to achieve self-support nor has it been demonstrated to operate sufficiently to ameliorate the damage of the allotment policy." (Doc. 1 at ¶ 52).

In discussing Section 5 of the IRA, the Eighth Circuit has noted that "[t]he statutory aims of providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from the prior allotment policy sufficiently narrow the discretionary authority granted to the Department." South Dakota II, 423 F.3d at 799. This Court, in South Dakota I, discussed the purposes of the IRA more generally as follows:

> Prior to the enactment of the IRA, Congress attempted to assimilate Indians into the country's mainstream through an allotment policy. General Allotment Act of February 8, 1887, 24 Stat. 388, as amended, 25 U.S.C. § 331 et seq. (1976 ed.) (§ § 331-33 repealed 2000). The policy of the General Allotment Act was simple: "to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society

15

at large." County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation, 502 U.S. 251, 254, 112 S.Ct. 683, 686, 116 L.Ed.2d 687 (1992). This policy was a failure, which resulted in a loss of more than 90 million acres of Indian land. Brendale v. Confederated Tribes and Bands of Yakima Indian Nation, 492 U.S. 408, 436 n.1, 109 S.Ct. 2994, 3011 n.1, 106 L.Ed.2d 343 (1989). As a result, Congress enacted the IRA in an "attempt to encourage economic development, self-determination, cultural plurality, and the revival of tribalism." Felix S. Cohen, Handbook of Federal Indian Law, 147 (1982 ed.). It was also stated that the IRA was designed to "rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 152, 93 S.Ct. 1267, 1272, 36 L.Ed. 2d 114 (1973) (quoting H.R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934)). In order to stem the staggering flow of land from Indian to non-Indian hands, the IRA set forth that "no land of any Indian reservation . . . shall be allotted in severality to any Indian." 25 U.S.C. § 461. Congress also tried to replenish Indian lands by permitting the Secretary of the Interior to acquire land in trust for Indians, noting that land held in trust is exempt from local and state taxation. 25 U.S.C. § 465.

South Dakota I, 314 F. Supp. 2d at 950-51.

The record demonstrates that the RD adequately detailed the self-support and economic benefits the Tribe would gain from taking the Wagner Heights Addition into trust. The BIA's acceptance of the Wagner Heights Addition into trust meets the statutory aims of Section 5 of the IRA. See South Dakota IV, 487 F.3d at 548 (finding that the BIA acted within statutory authority of Section 5 where director found that the tribe needed the land taken into trust to accommodate increased tribal membership and that the tribe's economy would benefit from the acquisition). Summary judgment for Defendants is proper on Count 6 of the Plaintiff's Complaint.

## C. COMMITTEE'S AUTHORITY TO REQUEST THAT LAND BE PLACED IN TRUST

16

Plaintiffs in Count 7 of their Complaint argue that the BIA lacked jurisdiction to consider the Tribe's trust application because the application came in the form of a resolution passed by the Committee. In Plaintiffs' view, the Committee "lacked the authority as a matter of tribal law to enact the Resolution." (Doc. 1 at ¶ 72).

Article IV, § 1 of the Tribe's Amended Bylaws states that:

> [t]he Committee shall have the authority to investigate and transact all Tribal business of a routine nature and Indian legislation, including Industry, Sanitation, Housing, Redevelopment and etc., and shall also act in the capacity of a liaison delegation between the Tribe and Federal, State and local governments, and such other agencies or parties that may offer opportunities for the Tribe.

See http://www.sdtribalrelations.com/files/yanktoncon.pdf (last visited March 11, 2011) (containing Tribe's Constitution and Amended Bylaws). Plaintiffs contend that the Committee's enactment of the resolution was not a matter of "routine nature" and that the Committee therefore exceeded their authority under tribal law. Whether Plaintiffs' interpretation of tribal law is correct, however, is a question for the Tribe and not for this Court to resolve. See In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig., 340 F.3d 749, 763-64 (8th Cir. 2003) ("Jurisdiction to resolve internal tribal disputes, interpret tribal constitutions and laws, and issue tribal membership determinations lies with Indian tribes and not in the district courts."); Runs After v. United States, 766 F.2d 347, 352 (8th Cir. 1985) (holding that the district court lacked jurisdiction to resolve "disputes involving questions of interpretation of the tribal constitution and tribal law.").

Section 151.9, the regulation concerning requests for approval of trust applications, states that a trust application "need not be in any special form but shall set out the identity of the parties, a description of the land to be acquired, and other information which would show that the acquisition comes within the terms of this part." 25 C.F.R. § 151.9. The regulation contains no

mention of any requirement that the Tribe in a Tribal Council of all members, as opposed to the Committee, be the entity requesting that land be taken into trust. In addition, it is questionable whether Plaintiffs have standing to assert that the Committee exceeded the authority granted to it by the Tribal Constitution. See Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) (listing requirements of standing). Accordingly, summary judgment for Defendants is proper on Count 7 of Plaintiffs' Complaint.

## D. DUE PROCESS CLAIMS

### 1. Denial of Access to Documents Before the RD

Plaintiffs argue in Count 8 of their Complaint and in their brief that the RD's failure to provide Plaintiffs with many of the documents on which she based her decision violated both Plaintiffs' right to due process and the federal regulations governing appeals of a subordinate BIA official's administrative action. The Supreme Court of the United States has made clear that:

> [a] party is entitled . . . to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it. Indeed, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation.

Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 288 n.4 (1974); see also Carson Prod. Co. v. Califano, 594 F.2d 453 (5th Cir. 1979) ("It is a fundamental proposition of administrative law that interested parties must have an effective chance to respond to crucial facts."); United States v. Owen, 415 F.2d 383, 388 (8th Cir. 1969) ("Inherent in the most narrow view of due process is the right to know of adverse evidence and the opportunity to rebut its truth and relevance."). Here, the RD's actions resulted in a violation of due process because Plaintiffs' lack of access to twenty-three documents in the administrative record precluded Plaintiffs from

18

addressing or rebutting before the RD a significant portion of the factual material on which the

RD relied in deciding to accept the Wagner Heights Addition into trust.

The RD's actions also violated 25 C.F.R. § 2.21(b), which provides:

> When the official deciding an appeal believes it appropriate to
> consider documents or information not contained in the record on
> appeal, the official shall notify all interested parties of the
> information and they shall be given not less than 10 days to
> comment on the information before the appeal is decided.

Id.; see also Acting Great Plains Reg'l Dir., 49 IBIA at 101 n.17 ("The Regional Director clearly

erred by failing to provide Appellants with copies of the supplemental information she requested

and received from the Superintendent.").

The IBIA found that the RD's violation of Section 2.21(b) was harmless, however,

because Plaintiffs "received a copy of the complete record on appeal to the [IBIA] and have been

able to respond to the supplemental documents in their pleadings before the [IBIA]." Id. The

IBIA then considered and rejected each of the seven arguments Plaintiffs claimed they would

have raised before the RD had Plaintiffs been given timely access to the complete administrative

record.[6] Acting Great Plains Reg'l Dir., 49 IBIA at 110-113. Defendants argue that Plaintiffs'

access to the complete administrative record on appeal and the IBIA's review of Plaintiffs'

---

[6] In their brief to this Court, Plaintiffs identified five arguments that Plaintiffs claim they
would have made to the RD. These five arguments are: 1) That the Committee does not have the
authority under tribal law to agree to a restrictive covenant on the Wagner Heights Addition and that
the Tribe's sovereign immunity would defeat any attempt to actually enforce the restrictive covenant;
2) that the RD's reliance on the 15 percent increase in tribal population was improper because the
increase may not represent the number of tribal members actually living in the vicinity of the Wagner
Heights Addition; 3) that the fire protection agreements were outdated and in need of revision; 4) that
the RD's reliance on the environmental assessment was improper because the documents were not
timely supplied to Plaintiffs; and 5) that the RD's statement that the BIA pays $38,000 per year to
the County for dispatch services was not supported by a document in the record and, in any event,
was irrelevant because BIA should pay for services it receives from the County.

additional arguments met the requirements of due process, thus rendering the RD's violation of Section 2.21(b) harmless.

The harmless error rule generally applies to judicial review of administrative decisions. See 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error."); All Indian Pueblo Council v. U.S., 975 F.2d 1437, 1443 (10th Cir. 1992); Jicarilla Apache Nation v. U.S. Dep't of Interior, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("The harmless error rule applies to agency action because if the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.") (citation and internal marks omitted). "The burden to demonstrate prejudicial error is on the party challenging the agency action." Jicarilla, 613 F.3d at 1121; see Shinseki v. Sanders, 129 S.Ct. 1696, 1706 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). "However, the harmless error rule is not a particularly onerous requirement, and the Supreme Court has cautioned courts applying the rule against using mandatory presumptions and rigid rules rather than case-specific application of judgment, based upon examination of the record." Jicarilla, 613 F.3d at 1121 (citing Shinseki, 129 S.Ct. at 1706 (internal marks omitted)). "If prejudice is obvious to the court, the party challenging agency action need not demonstrate anything further." Id. (citing Shinseki, 129 S.Ct. at 1706).

When an agency's violation of a procedural rule precludes an interested party from presenting certain colorable arguments to the ultimate decision maker, courts have found that the agency's error was more than harmless. See Gerber v. Norton, 294 F.3d 173, 182-185 (D.C. Cir. 2002) (declining to find harmless error where agency's violation of procedural rule prevented plaintiffs from commenting on certain evidence and plaintiffs specified three arguments they

20

would have made if provided with the evidence in a timely manner); Am. Radio Relay League, Inc., v. F.C.C., 524 F.3d 227, 236-39 (D.C. Cir. 2008) (agency's refusal to provide plaintiffs with unredacted studies agency relied on in promulgating administrative rule was not harmless where plaintiffs demonstrated that they had "something useful to say" regarding unredacted studies that could allow plaintiff to "mount a credible challenge" if given the opportunity); see also Craig Smith, Taking "Due Account" of the APA's Prejudicial-Error Rule, 96 Va. L. Rev. 1727, 1744 (2010). The 23 documents that the RD considered but did not provide to Plaintiffs constitute the majority of the material considered. This is not a situation where Plaintiffs already had knowledge or possession of all such documents, where the documents would be unquestionably subject to judicial notice or where the documents avail themselves of only one interpretation and application to matters at issue. Rather, the nature of some of the documents, the volume of the documents relative to the entire file, the use of the documents in the RD's decision, and Plaintiffs' identification of five additional arguments they would have made before the RD had Plaintiffs had the opportunity suggests more than "harmless error." See Shinseki, 129 S.Ct. at 1707 ("[T]he factors that inform a reviewing court's 'harmless-error' determination are various, potentially involving, among other case-specific factors, an estimation of the likelihood that the result would have been different, an awareness of what body (jury, lower court, administrative agency) has the authority to reach that result, a consideration of the error's likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings, and a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference.").

Whether the RD's violation of the Due Process Clause and Section 2.21(b) was harmless also turns in part on the standard of review exercised by the IBIA in trust acquisition cases. If the IBIA may or actually does conduct a de novo review of trust acquisition cases, then Plaintiffs may not have suffered any prejudice and were given due process because Plaintiffs had an opportunity to review all of the evidence before arguing in front of the ultimate fact finder. If, however, the IBIA reviews trust acquisition cases under a deferential standard and cannot replace the RD's discretion with its own, then the IBIA's consideration of Plaintiffs's new arguments neither rendered the RD's violation of Section 2.21(b) harmless nor provided Plaintiffs with due process.

"The IBIA's standard of review differs depending on whether the appellant raises issues of law or challenges a BIA official's exercise of discretion." Cohen's Handbook of Federal Indian Law, § 7.04[2] (citing Kansas v. Acting Southern Plains Reg'l Dir., 36 IBIA 152 (2001)). In trust acquisition cases such as the present one, the IBIA exercises the following standard of review:

> Decisions of BIA officials on requests to take land into trust are discretionary, and the Board does not substitute its judgment in place of BIA's judgment in discretionary decisions. Instead, the Board reviews discretionary decisions to determine whether BIA gave proper consideration to all legal prerequisites to the exercise of BIA's discretionary authority, including any limitations on its discretion established in regulations. Thus, proof that the Regional Director considered the factors set forth in 25 C.F.R. § 151.10 must appear in the record, but there is no requirement that BIA reach a particular conclusion with respect to each factor. Nor must the factors be weighed or balanced in a particular way or exhaustively analyzed. Moreover, an appellant bears the burden of proving that BIA did not properly exercise its discretion. Simple disagreement with or bare assertions

22

> concerning BIA's decision are insufficient to carry this burden of
> proof.

Acting Great Plains Reg'l Dir., 49 IBIA at 98. The IBIA thus does not engage in a de novo

review of the RD's analysis in trust acquisition cases. Nor can the IBIA substitute its judgment

for that of the RD. Instead, the IBIA can only look at the RD's decision and "determine whether

BIA gave proper consideration to all legal prerequisites to the exercise of BIA's discretionary

authority . . ." Id.

The Eighth Circuit dealt with a somewhat analogous issue in United States v. Owen, 415

F.2d 383 (8th Cir. 1969). Owen concerned the selective service board's violation of a defendant's

due process rights by classifying the defendant as available for military service without first

apprising the defendant of adverse evidence in his file and giving him an opportunity to rebut it.

Id. at 389. The Eighth Circuit found that the defendant's opportunity to rebut the adverse

evidence before a court did not cure the due process violation. Id. The Court explained that:

> [t]he courts do not sit as super draft boards, substituting their
> judgments on the weight of the evidence for those of the
> designated agencies, and are limited in review to determining
> whether a classification has a basis in fact, or whether a registrant
> was denied due procedural fairness. These issues must be
> decided on the basis of the evidence and information in the
> administrative record. The courts have no role in classification,
> and the deprivation of a basic procedural right cannot be cured
> before the trial court.

Id. (internal marks and citations omitted). Similarly, the IBIA in a case of this nature applies a

deferential standard of review of the RD's fact finding, and thus does not cure the RD's violation

of Plaintiffs' due process rights under these circumstances.

23

Because Plaintiffs did not have access to the complete administrative record before the RD, Plaintiffs were denied the opportunity to make their additional arguments to the decision-maker who actually had the discretionary authority to consider the arguments. Whether Plaintiffs' additional arguments would have persuaded the RD to reach a contrary decision is not for the IBIA or this Court to decide. Accordingly, the RD's noncompliance with Section 2.21(b) was not harmless and violated Plaintiffs' right to due process. This Court thus remands the BIA's decision to accept the Wagner Heights Addition into trust to the RD for proceedings consistent with this opinion.[7] Consequently, summary judgment for Plaintiffs on Count 8 is proper.

## 2. The RD's Bias

Plaintiffs claim in Count 9 of their Complaint and in their brief that their due process rights to a neutral decision-maker were violated because of bias on the part of the RD. This claim deserves decision because the same RD might consider the matter on remand.

A fair and unbiased tribunal is a fundamental requirement of the Due Process Clause. See In re Murchison, 349 U.S. 133, 136 (1955) ("a fair trial in a fair tribunal is a basic requirement of due process."); Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."). This requirement applies to courts and administrative agencies alike. See Withrow v Larkin, 421

---

[7] It is unnecessary to remand the case to the level of the Superintendent. See City of Eagle Butte, South Dakota v. Great Plains Reg'l Dir., 38 IBIA 139, 139-40 (2002) (remanding only to the level of the Regional Director in trust acquisition case where both Regional Director and Superintendent engaged in deficient analysis of Part 151 factors); Ziebach Cnty., South Dakota, 36 IBIA 201, 204 (2001) (same). Instead, remand to the RD with the directive to conduct a de novo review is sufficient to provide Plaintiffs with due process. See Acting Great Plains Reg'l Dir., 49 IBIA at 102 ("As a practical matter, the Superintendent is subordinate to the Regional Director, and therefore the Regional Director may opt to either reverse (or vacate) and remand or to decide the matter herself.").

U.S. 35, 46-47 (1975) (noting that the fair tribunal requirement of due process "applies to administrative agencies which adjudicate as well as to courts."); Deretich v. Office of Admin. Hearings, State of Minn., 798 F.2d 1147, 1152 (8th Cir. 1986) ("[A] hearing officer must be impartial for an administrative agency to meet the requirements of due process.") (citations omitted); see also South Dakota III, 401 F. Supp. 2d at 1011 ("The Department of Interior's review of an application to take land into trust is subject to the due process clause and must be unbiased.") (citations omitted).

However, "[i]t requires a substantial showing of bias to disqualify a hearing officer in administrative proceedings or to justify a ruling that the hearing was unfair." United States ex rel. De Luca v. O'Rourke, 213 F.2d 759, 765 (8th Cir. 1954). A party claiming bias on the part of an administrative tribunal must overcome "a presumption of honesty and integrity in those serving as adjudicators." In re Morgan, 573 F.3d 615, 624 (8th Cir. 2009) (quoting Withrow, 421 U.S. at 47.). "Plaintiffs bear the heavy burden of establishing that the administrative hearing was unfair." South Dakota III, 401 F.Supp. 2d at 1011 (citing Cent. Ark. Auction Sale, Inc. v. Bergland, 570 F.2d 724, 731 (8th Cir. 1978)).

Plaintiffs allege that several different factors show that the RD was biased. First, Plaintiffs argue that the RD "suppressed" a number of documents she relied on in making her decision. Plaintiffs point to no evidence that the RD purposefully "suppressed" these documents. A bald assertion that an act was motivated by bias does not necessarily make it so.

Second, Plaintiffs take issue with the following language from the RD's decision letter: "the State is . . . allowed to make comments on this trust acquisition . . . but the State is **not** the deciding official here." (A.R. 1376) (emphasis in original). Plaintiffs claim that this "sarcasm"

25

shows the RD's "impermissible attitude" toward Plaintiffs.   However, "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display," are not enough to establish bias in a judicial proceeding. Liteky v. United States, 510 U.S. 540, 555-56 (1994).

Third, Plaintiffs point to the RD's miscalculation of the tax loss that local units of government would suffer if the Wagner Heights Addition was removed from the tax rolls. In her decision letter, the RD explained that Charles Mix County stood to lose $39,497 in taxes, compared this amount to the County's total annual tax budget of $2,744,755, and found that the County's loss would amount to less than a ".01 percent decrease" in tax revenue. (A.R. 1372). The RD made a computational error, however, as a loss of $39,497 is actually less than 1.4 percent of the County's budget. Acting Great Plains Reg'l Dir., 49 IBIA at 93 n.13. Plaintiffs argue that the RD's error shows bias. This Court dealt with a similar argument in South Dakota III. There, the plaintiffs argued that two errors in an RD's decision established that the RD was biased against them. This Court disagreed, however, and found that "the mere fact that the [RD] made two erroneous findings is insufficient to overcome the presumption that the [RD] was unbiased." South Dakota III, 401 F. Supp. 2d at 1012. This Court reaches the same conclusion here.

Fourth, Plaintiffs contend that a December 9, 2006 email sent by the Deputy Realty Officer to five BIA employees shows that the RD prejudged the case and then gathered facts to support her decision. In her email, the Deputy Realty Officer asked for additional information about the Wagner Heights Addition fee-to-trust transaction, and stated that "I have a draft decision letter written on the Appeal, supporting the Supts [sic] August, 25, 2004 decision to

26

bring this property into trust." (A.R. 1152). This is not enough to show that the RD

impermissibly prejudged the case. First, this email was written by the Deputy Realty Officer,

not the RD. Second, the Deputy Realty Officer's completion of a draft decision letter does not

establish that the decision letter remained unmodified or that the RD's mind was irrevocably

closed. See 2 Richard J. Pierce, Jr., Administrative Law Treatise, § 9.8 (5th ed. 2010) ("A claim

of impermissible prejudgment of contested adjudicative facts must be supported by evidence of

prejudgment and evidence that the official who prejudged actually had a decisionmaking role.").

Plaintiffs also take issue with another email written by the Deputy Realty Officer. The email,

in pertinent part, reads:

> John Guhin has requested a copy of the complete adm [sic] record
> in the Yankton F2T case filed at IBIA. I don't have any problems
> releasing a copy as the State is an interested party in the Appeal.
> However our former Regional Director insisted that we follow the
> Freedom of Information Act request and have the State pay for
> copies, time spent researching. [sic] etc. However, for all other
> interested parties (on appeal at IBIA), we have released a copy of
> the admin record to them, without charge or going through the
> Freedom of Inf. Act. This was done in the past. So it appears we
> may be treating the State differently.

(A.R. 1298). Plaintiffs claim that this email demonstrates that the RD was biased and that the

former RD intervened to thwart Plaintiffs' access to the administrative record. Plaintiffs offer

no evidence, however, that the unnamed "former regional director" played any role in the RD's

decision to accept the Wagner Heights Addition into trust. Nor do Plaintiffs offer any evidence

that the RD was somehow involved with the "former regional director's" policy of following the

FOIA rather than providing the State with the administrative record free of charge. Instead, the

Deputy Realty Officer appears to be explaining how the "*former* regional director" did things in

27

the past, and seeking guidance now that the "former regional director" is no longer involved with such decisions.

Finally, Plaintiffs contend that by allowing the Superintendent to publish notice in <u>Indian Country Today</u>, the RD showed that she was biased against Plaintiffs. However, Plaintiffs fail to provide any evidence that the RD was involved in the Superintendent's decision to publish notice in <u>Indian Country Today</u>. Even if the RD somehow was involved in the Superintendent's publication decision, it would not warrant a finding that Plaintiffs' due process rights were violated. Moreover, as discussed below, the BIA ultimately took the land out of trust to allow this case to proceed.

In short, "the mere fact that a decision was reached contrary to a particular party's interest cannot justify a claim of bias, no matter how tenaciously the loser gropes for ways to reverse his misfortune." <u>Marcus v. Dir., Office of Workers Comp. Programs</u>, 548 F.2d 1044, 1051 (D.C. Cir. 1976). Plaintiffs' numerous arguments neither amount to a "substantial showing of bias" nor overcome the "presumption of honesty and integrity in those serving as adjudicators." <u>See South Dakota v. Dep't of Interior</u>, No. Civ. 10-3007, 2011 WL 382744 at *5-6 (D.S.D. Feb. 3, 2011) (rejecting the plaintiffs' claims that BIA decision maker was biased). Summary judgment is proper for Defendants on Count 9 of Plaintiffs' Complaint.

**E.  OTHER CLAIMS**

In Counts 10, 11, and 12, Plaintiffs assert claims related to Defendants' publication of notice under 25 C.F.R. § 151.12(b) in <u>Indian Country Today</u>, which Plaintiffs assert is not a "newspaper of general circulation serving the affected area." This Court need not decide this issue for two reasons. First, the BIA withdrew the Wagner Heights Addition from trust and republished notice

28

in a local newspaper so as to "permit the correction of administrative process under 25 C.F.R. § 151.12(b)." (Doc. 25-1). Second, this case if being remanded to the RD because summary judgment for Plaintiffs is proper in Count 8.

In Count 14, Plaintiffs claim that the decision of the RD was arbitrary, capricious, irrational, unsupported by the record and constituted an abuse of discretion. (Doc. 1 at § 88). This case is being remanded to the RD to allow Plaintiffs to make arguments based on the 23 documents considered by the RD without Plaintiffs' prior knowledge. Many of those arguments related to the factors under 25 C.F.R. Part 151. The RD will need to consider those factors anew on remand and upon complying with 25 C.F.R. § 2.21(b).

## IV. CONCLUSION

This Court is mindful of the irony that Plaintiffs are prevailing on due process grounds in preventing land owned by the Tribe from being placed in trust status at this time. This very land of course was under the control of Native Americans for centuries until, without much regard for due process or the well-being of Native Americans and their culture, the land came to be privately owned. The violation of due process and Section 2.21(b) is not the fault of the Yankton Sioux Tribe. This Court urges that, on remand, the RD, and if there is an appeal, the IBIA, act promptly on the Tribe's request for this land to be taken into trust.

For the reasons discussed above, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. 13) is granted in part and denied in part. Defendants' Motion for Summary Judgment is granted on Counts 1, 2, 3, 4, 5, 6, 7 and 9 of Plaintiffs' Complaint, denied on Count 8, and denied as moot as to Counts 10, 11, 12, 13 and 14. It is further

29

ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 20) is granted as to Count 8 and otherwise denied. It is finally

ORDERED that the IBIA decision is vacated and the case is remanded to the IBIA with instructions that the IBIA remand to the RD for the RD, after providing notice under Section 2.21(b), to conduct a de novo review and consider argument on the 23 documents discussed above and any other documents before making a decision on the application.

Dated March 31, 2011.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE